BURBANKS *v.* LEPOVSKY.

1. MALICIOUS PROSECUTION—ADVICE OF COUNSEL—QUESTION FOR JURY.

Where, in an action for malicious prosecution, plaintiff's testimony showed he was not guilty of the crime for which he had been prosecuted, and that defendant had no reason for believing he was, and defendant's testimony failed to show that he stated all of the facts to the prosecuting attorney, upon whose advice plaintiff was arrested, plaintiff was entitled to

have submitted to the jury the question whether his testimony of the circumstances omitted from defendant's statement to the prosecutor established such facts.

2. SAME—BAD FAITH.
    In an action for malicious prosecution, the advice of counsel is no defense to a person acting in bad faith.

3. SAME—PROBABLE CAUSE—FAILURE OF JURY TO ACQUIT.
    The failure of the jury to acquit plaintiff of the crime for which he was prosecuted is not conclusive on the subject of probable cause.

Error to Sanilac; Beach, J. Submitted June 10, 1903. (Docket No. 60.) Decided September 15, 1903.

Case by Frank E. Burbanks against David Lepovsky and Alexander Lepovsky for false imprisonment and malicious prosecution. From a judgment for defendants on verdict directed by the court, plaintiff brings error. Reversed.

*Wilford Macklem*, for appellant.

*W. H. Burgess*, for appellees.

HOOKER, C. J. The testimony in this cause shows that the plaintiff was an insurance agent, and insured the defendants against loss by fire in the sum of $1,000 upon their stock of merchandise at Bad Axe. The premium was $55; $20 of which was paid in cash, and the remainder was applied upon an account due them from the plaintiff. There was an understanding that the defendants expected to soon move their stock to Minden City, and it was agreed that in that event the plaintiff should cancel the policy *pro rata*, and issue new insurance to cover the stock in its new location. A short time afterwards the defendants removed to Minden City, and the policy was sent to the plaintiff, with the request that he cancel it, and issue a new policy for $3,500 in the Imperial Insurance Company. Plaintiff testified that David Lepovsky had authorized him to do what was necessary to accomplish the readjust-

ment of the insurance. Accordingly he wrote a receipt for the unearned premium, and signed the Lepovsky firm name to it, and sent it to the company with the first policy. He also sent daily reports to three companies, one of which was the Imperial, showing the issue to the defendants of policies amounting to $3,500. He testified that he afterwards saw David Lepovsky, and told him what he had done, and that he seemed satisfied; but that a day or two later he called upon him for the policies, and plaintiff told him that he had not heard from the companies yet, but would in a day or two, and he would then deliver them. Lepovsky replied that he would have them that day or never. He never received them. Subsequently he made complaint against the plaintiff for forgery of the receipt mentioned. A warrant was issued, and the plaintiff was arrested, bound over, and tried at the circuit, whereupon, after a disagreement of the jury, the case was *nolle prossed*. Subsequently this action was begun for false imprisonment, and upon trial the court directed a verdict for the defendants, and the plaintiff has brought error.

In addition to the facts already stated, the plaintiff produced testimony that one of the defendants had stated to a bank cashier that he "had Burbanks fast," and that he "would hang Burbanks higher than the Jews hung Christ;" that the other defendant had said shortly after Burbanks' arrest that "he would see him in Jackson, or spend a thousand dollars to see him there." David Lepovsky signed and allowed to be published a statement that the case against Burbanks had been brought on, he had pleaded guilty, and was held to the circuit court. One Yakes had a talk with both defendants about this before such publication, and advised caution about publishing it. The younger Lepovsky (Alex.) stated that "he did not care for that; they had too much money for Burbanks to law them; they would outwind him; they would law him until he could not follow them; they had a thousand dollars they would spend, if it was necessary, to send Burbanks over the road." The sheriff testified that on the

day of the examination, after plaintiff was bound over, he heard one of the defendants say that "he was going to send him over the road," and that "he seemed very glad and elated."

The defendants were not sworn, but called the prosecuting attorney, who testified that one Cox, an insurance agent, and Lepovsky came to see him about the charge against Burbanks, and made a statement of the details, showed him the receipt, and some letters. He could not give the conversations verbatim, but he had two or three talks about it, and he knew a good deal about it besides what he got from them, and that he directed the defendant David to make the complaint. When asked whether defendant stated any conversation about the return premium, he said:

"That matter was talked over, I remember; but I can't remember the exact conversation now, but perhaps you can draw my attention to it; but I can't give it now, I don't believe. I can say this: That there was nothing developed in the testimony, either before the justice or on the trial, that was new to me. I conducted the examination as prosecutor before the justice and the trial before this court. My recollection is now—but I am not positive—that I went to Minden, talked with the boys, and made an investigation before the papers were issued.

"Q. What did you advise Mr. David Lepovsky to do in the matter?

"A. If that assumes I went, I wouldn't want to answer; but I will say this: After I made the investigation, I did advise Mr. Lepovsky to make that complaint. I think Mr. Dawson came into my office and did the writing in the complaint and warrant, and I dictated it. I had charge of the case from the making of that complaint to the termination of the case. The various steps were taken under the direction of the sheriff and myself. I always consulted with him in all those matters, and we acted together. My impression is that the adjournments before the justice were made by agreement, and arranged at such times as would be satisfactory to the people's witnesses and the defendant's attorney and myself and the sheriff. I understood this man Cox to be an agent or an employé of the company to which that receipt purported to have

been given. I talked with Mr. Cox fully on the matter, and learned all he claimed to know about it. There were some letters from Mr. Burbanks, and I think there were what purported to be either press copies or typewritten copies of letters they had written to him. I saw quite a number of letters. I haven't any of the letters; they were returned.

"*Q.* Whether or not David Lepovsky informed you before the complaint was made that he did not sign the receipt that was claimed to have been forged?

"*A.* He did tell me that he didn't sign it.

"*Q.* And the receipt he had at that time in your presence?

"*A.* I am not going to say that,—whether it was from him or Cox; but I had it before the warrant was made. I am positive that Mr. Lepovsky saw that receipt in my hands, whether he brought it or Cox brought it, before the warrant was made; and denied the signature. In fact, I was somewhat familiar with Mr. Lepovsky's handwriting. He had written to me in regard to some matters, as I remember it, and I had seen some of his handwriting, and I had seen some of Mr. Burbanks' handwriting, and it was not Mr. Lepovsky's, I didn't think.

"*Q.* Whether or not at that time he told you that he had not authorized Burbanks to sign the name Alex. Lepovsky & Co.?

"*A.* He told me that he did not authorize it.

"*Q.* Whether the young man told you the same thing?

"*A.* He did."

Witness stated, under objection of plaintiff, that "Cox related to me a conversation he had with Burbanks at Minden." "Mr. Lepovsky told me all about moving his goods from Bad Axe to Minden, and how he came to require this insurance. I knew all about it anyhow."

This is the substance of his direct examination. On cross-examination he testified:

"Mr. David Lepovsky was the man that furnished me all the information as to what occurred between him and Mr. Burbanks, and I relied on what he told me.

"*Q.* Did you base your action on what he stated to you as to what occurred between him and Burbanks?

"*A.* I didn't divide the case. I took together what I got from all.

" *Q.* I ask you whether you had any other source of information as to what occurred personally as to conversations between Lepovsky and Burbanks, other than Lepovsky?

"*A.* I answered you twice. I said, only so far as they were corroborated by other circumstances and other things.

" *Q.* What other information did you have that you undertake to say corroborated?

"*A.* What I got of Mr. Cox, and what I got from the younger Lepovsky, and the letters, and all the information together.

" *Q.* Did Mr. Cox claim that he was at Minden at any time, and heard any conversation between Mr. Lepovsky and Mr. Burbanks?

"*A.* I can't say that he did. Mr. Lepovsky did not tell me that he had requested Mr. Burbanks to cancel that policy, and apply the proceeds on any other insurance; nor did he tell me that he had authorized Mr. Burbanks to take any step necessary to cancel the policy.

" *Q.* If he had told you that he had authorized Mr. Burbanks to cancel that policy, and take the money and apply it on other insurance for him, and that Mr. Burbanks had written other insurance and applied on other and different policies for him, would you have ordered the prosecution?

"*A.* I don't think so.

" *Q.* Did Mr. Lepovsky tell you that he had got angry because Mr. Burbanks did not deliver the policies to him when he asked for them?

"*A.* No; he did not tell me anything of any conversation that occurred up there at his place as I heard since; there was nothing of that at all.

" *Q.* Did Mr. Lepovsky tell you that he had authorized Mr. Burbanks to sign that receipt?

"*A.* No, sir; I told you he didn't.

" *Q.* Had he told you that he had authorized Mr. Burbanks to sign that receipt, would you have ordered the prosecution?

"*A.* No, sir; decidedly not. No matter what the rest of it was, he wouldn't have got any complaint or warrant if he had told me that.

" *Q.* And if he had told you he had authorized him to take any steps necessary to draw that money and get it and apply it on other insurance, would you have ordered it then?

"*A.* No; I should consider that he told Burbanks to do whatever Burbanks thought was necessary to do, and whatever Burbanks did was authorized.

" *Q.* If he had told you that he was pushing the matter for personal spite, and was only doing it for personal malice, would you have ordered a complaint?

"*A.* No; if I thought it was personal spite, I wouldn't permit a prosecution anyhow for personal matters.

" *Q.* You stated that you thought you went up there and consulted the boys?

"*A.* I know I talked with Lepovsky's two boys, but I said then, and I say now, that I am not sure whether it was before the complaint was made, or whether it was after the arrest and before the examination. I would not be positive about that.

" *Q.* If you had known, or if Mr. Lepovsky had told' you, that when he gave the policy to Mr. Burbanks to be canceled, or had it brought to Mr. Burbanks, he ordered him to write him up $3,500 other insurance, and to apply the money, would you have ordered a prosecution?

"*A.* That is the question you asked me before, practically. I wouldn't decide on that alone. I don't think I would have decided on that alone.

" *Q.* Did he so tell you?

"*A.* No, he did not.

" *Q.* You said in your redirect, to Mr. Burgess, that he told you about moving his goods from Bad Axe. Did he tell you also about his ordering $3,500 insurance of Mr. Burbanks?

"*A.* My impression is that it wasn't spoken of the first time, but, when we learned that would enter in, he told me he had not ordered it. My impression is he didn't tell me at first because we didn't know what the defense would be, but, when that was put up for a defense, he told me he hadn't.

" *Mr. Gates:* We object to that, and ask that it be stricken out.

" *The Court:* I suppose the term 'put up' is not used in an offensive sense?

" *Witness:* Did I use the words 'put up?' I will withdraw that, and substitute the words ' defense put forward.'

" *Q.* He didn't tell you about the $3,500 of insurance?

"*A.* I understand I first learned of that from the defense.

" *Q.* He denied that to you?

"*A.* That was always denied by both of them; that is, if you are speaking of the insurance that Mr. Burbanks claimed he put up for them on their order.

" *Q.* I will repeat my question: I ask you again if, in any conversation, Mr. Lepovsky, either David or Alexander, stated to you that they, or either of them, had ordered $3,500 of insurance through Mr. Burbanks, on their goods, after coming to Minden City?

"*A.* If that is the $3,500 insurance mentioned by Burbanks as being ordered by them to pay that return premium, then that was never mentioned to me by them. If it refers to the insurance that he had upon his goods there, I am inclined to think that at some time in that transaction I did learn that there was some insurance ordered upon the goods there at Minden City after they came there, of Mr. Burbanks, by Mr. Lepovsky. Just the amount of it I cannot remember."

This was all of defendants' testimony. The plaintiff had already shown the court proceedings both before the justice and at circuit.

If the evidence adduced by the plaintiff is true, it is manifest that he was not guilty of forgery, and that the defendants had no reason for believing that he was; while the testimony offered by the defendants fails to show conclusively that they stated all of the facts to the prosecuting attorney. On cross-examination that officer admitted that many circumstances which the defendants must have known, if true, were not stated to him, and that he would not have advised a prosecution if they had been. Whether they were true or not was a question of fact for the jury, inasmuch as plaintiff's testimony tended to prove them. Again, there is proof in this record which entitled the plaintiff to go to the jury on the question of defendants' belief in plaintiff's guilt. The following cases are in point on these questions: *Harris* v. *Woodford*, 98 Mich. 149 (57 N. W. 96), which holds that advice by counsel does not protect one who acts in bad faith. See authorities cited therein; also *Bennett* v. *Eddy*, 120 Mich. 309 (79 N. W. 481); *Rankin* v. *Crane*, 104 Mich. 9 (61 N. W. 1007).

The fact that plaintiff was required to appear at circuit court, where a jury failed to acquit him, is not conclusive on the subject of probable cause. See *Fine* v. *Navarre*, 104 Mich. 94 (62 N. W. 142); *Pawlowski* v. *Jenks*, 115 Mich. 275 (73 N. W. 238).

Counsel contends that the disagreement of the jury and subsequent *nolle pros.* do not establish *prima facie* want of probable cause. That might be conceded, and, further, that *prima facie* it showed probable cause; yet the case should have gone to the jury upon the question, because plaintiff's testimony, if believed, was sufficient to overcome such *prima facie* case, and establish the want of probable cause.

The judgment is reversed, and a new trial ordered.

The other Justices concurred.